THE LAW OFFICES OF GREGORY W. SMITH
Gregory W. Smith, State Bar No. 134385
Diana Wang Wells, State Bar No. 284215
9100 Wilshire Boulvard, Suite 345E
Beverly Hills, California 90212
Telephone No. 1-310-777-7894
Telecopy No. 1-310-777-7895
Email dwells@gwslegal.com

THE LAW OFFICES OF JOHN A. SCHLAFF
John A. Schlaff, State Bar No. 135748
2355 Westwood Boulevard, No. 424
Los Angeles, California 90064
Telephone No. 1-310-474-2627
Telecopy No. 1-310-362-8883
Email john.schlaff@gmail.com

Counsel for Plaintiff,
TARA JAN ADAMS

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARA JAN ADAMS<br><br>Plaintiff,<br><br>vs.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, PAUL Tanaka, CHUCK ANTUNA, GREG SIVARD, JUAN SANCHEZ VINCENT CALLIER AND DOES 1-10,<br><br>Defendants. | CIVIL ACTION NO. 15-CV-4501<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES** |

## COMPLAINT

1. The plaintiff, Tara Jann Adams ("Plaintiff"), complains for entry of judgment in her favor against Defendants the Los Angeles County Sheriff's Department (the "LASD"), former Undersheriff Paul Tanaka, Captain Chuck Antuna, Greg Sivard,

Juan Sanchez, Lt. Sheriff Vincent Callier and Does 1-10 (collectively, "Defendants"). The Defendants other than the LASD (i.e., the individual, non-entity defendants) are sued in their individual capacities for acting inappropriately and under color of law and are hereinafter collectively referred to as the "Cabal".

2. In support of her Complaint, Plaintiff alleges and avers as follows:

## NATURE OF ACTION AND JURISDICTION

3. This civil action arise under 42 U.S.C § 1983, *inter alia,*, seeking damages and injunctive relief against the Cabal in their individual capacities for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States; retaliating against Plaintiff for her exercise of her constitutionally protected right of free speech and to testify in Court; and against the LASD for refusing or neglecting to prevent such deprivations and denials to Plaintiff, and ultimately ratifying same.

4. This case arises under the United States Constitution and 42 U.S.C. §§ 1983 and 1988, as amended. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

5. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district; evidence and employment records relevant to the allegations are maintained in this judicial district; Plaintiff would be employed in this judicial district but for the unlawful actions and practices of the Defendants; and the Defendants are domiciled and regularly conduct affairs in this judicial district.

## PARTIES

**Plaintiff**

6. Plaintiff Tara Jann Adams is a former deputy Sheriff who was employed as a Los Angeles Deputy Sheriff from 2007 to June 14, 2014 when she was constructively

terminated. As shall be seen, Ms. Adams was the one deputy sheriff in the LASD who stood up to, and refused to cooperate in, a scheme orchestrated by, among others, Undersheriff Paul Tanaka, to obstruct a federal investigation into illegal practices at the LASD violative of the constitutional rights of the inmates in the LASD's charge. She would be repaid for her acts of courage by shunning, threats and ultimately the termination of her career.

**Defendants**

7. Defendant Los Angeles County Sheriff's Department is one of the largest, if not the largest, Sheriff's departments in the Country. It was also the former Plaintiff's former employer.

8. Defendant and former Undersheriff Paul Tanaka was the second most powerful person in the LASD. Plaintiff is informed and believes and thereon alleges that Mr. Tanaka was the architect and leader of a conspiracy to obstruct justice by hiding various jail inmates from federal investigators inquiring into misconduct in the LASD while falsely acting under color of law. The participants in the conspiracy have previously been referred to as the "Cabal".

9. Defendant Chief Sheriff Chuck Antuna is and was an official within the LASD with close ties to Defendants and to Defendant Tanaka. Defendant Antuna was among the persons with supervisory power over Plaintiff during her tenure at the LASD.

10. Defendant Greg Sivard was and is a civilian supervisor in the inmate reception center at the Los Angeles County Jail.

11. Defendant Capt. Vincent Callier is and was a lieutenant sheriff and a supervisor of Plaintiff.

12. Defendant Deputy Sheriff Juan Sanchez is and was a deputy sheriff.

13. Plaintiff is informed and believes and thereon alleges that each of the individual Defendants was acting in concert with, and at the direction of, the other individual Defendants in a joint effort to chill and retaliate against Plaintiff's exercise

of her constitutional right to free speech, and to give truthful testimony in the federal courts. Each of the individual Defendant knew and had reason to know that their acts in this regard were illegal.

14. The true names and capacities of Does 1-10 are currently unknown to Plaintiff, but Plaintiff is informed and believes that they contributed to or caused her injuries complained of herein. Plaintiff will amend this complaint as their identities are discovered.

## FACTS

15. Plaintiff was hired as a deputy sheriff in March 2007. She completed her studies at the Sheriff's Academy in July of that same year. Plaintiff's ultimate goal upon joining the LASD was to be a patrolling Deputy Sheriff. She continued to have that career goal throughout her tenure at the LASD.

16. Plaintiff's first assignment was in the Inmate Reception Center (the "IRC") in the Los Angeles County jail (the "LAJ"). The IRC and its personnel are responsible for handling inmate intake and releases from the LAJ. The IRC also maintain inmate "jackets" – the files which contains information regarding, among other things, (1) the inmates' current location within the LAJ; (2) the reason for their commitment to the LAJ; and (3) whether they are to be released of the street after their commitment LAJ, or whether they are to be sent to prison upon leaving LAJ's custody.

17. Plaintiff did well in the Academy and in her position at the IRC. Her reviews were always laudatory, and her supervisors and coworkers gave her the impression that she was both well-respected and well-liked.

18. In late 2009, Plaintiff was promoted to a watch commander's position at the IRC. In that position, Plaintiff supervised other deputy sheriffs working in the IRC, and also worked closely with civilian workers assigned to the IRC.

19. From time to time, in the course of her work, Plaintiff would have occasion to also deal with deputy sheriffs in the LAJ's anti-gang unit which was known as Operation Safe Jails (the "OSJ"). It was plaintiffs general impression that the

deputies within the OSJ cultivated a "bad boy" image and were routinely involved in trying to circumvent the procedural rules of the LAJ and LASD..

20. Plaintiff is informed and believes and thereon alleges that in part because of improprieties committed by the OS J deputies, and sanctioned by Defendant Tanaka (among others) within the hierarchy of the LASD, the LASD came to be under federal investigation sometime between 2009 and 2011.

21. Plaintiff is also informed and believes and thereon alleges that in connection with that investigation (but unbeknownst to Plaintiff at the time), Federal law enforcement officials were attempting to interview an LAJ inmate, Anthony Brown. The Cabal wanted to hide Mr. Brown from the federal investigators because Mr. Brown was expected to testify in a fashion which would implicate them.

22. In August 2011, Plaintiff arrived for work to find three OSJ deputies and a lieutenant sheriff, Lt. Libertone, waiting for her in her office. The OSJ deputies asked her to enter into the system that Anthony Brown was being released from the LAJ. Upon checking Mr. Brown's record, Plaintiff discovered that although he was currently at the jail, Mr. Brown was under a substantial prison sentence. Not only would it be contrary to accepted practices and regulations for her to have released Mr. Brown under such circumstances, her doing so could have resulted in Mr. Brown being released to the streets.

23. Plaintiff informed the OSJ deputies and her supervisor Lt. Libertone that the only way that Mr. Brown could be released consistent with regulations was if he was simultaneously rebooked. The OSJ deputies became loud and combative and told Plaintiff that they were under orders from undersheriff Tanaka that Mr. Brown be removed from the system altogether and implied and explicitly stated that Plaintiff would be in deep career trouble if she did not comply with their requests.

24. Lt. Libertone remained strangely silent throughout this exchange which grew more and more heated with each passing minute. Plaintiff demanded that the OSJ deputies provide her with a written order from undersheriff Tanaka – something they

refused to do.  Ultimately, Plaintiff and the OSJ deputies were shouting at each other.

25. After the argument between Plaintiff, on the one hand, and the OSJ deputies, on the other hand devolved into a shouting match, one of the civilian personnel in the IRC, Gus Acadamia, without Plaintiff's permission or approval entered into the system that Mr. Brown was being released and announced the OSJ deputies that there was nothing more to argue about because he had complied with their request.

26. At this point, one of the deputies took from Mr. Acadamia Mr. Brown's "jacket" and proceeded to put it in a manila envelope.  Plaintiff protested that this also was against regulations and could lead to the inadvertent release of Mr. Brown despite his outstanding prison sentence.  The OSJ deputies ignored Plaintiff's protests in this regard.  Again, Lt. Libertone remained strangely impassive throughout this episode.

27. Approximately a week later, three different OSJ deputies arrived at Plaintiff's office and asked her to retroactively rebook Mr. Brown – apparently to make it appear as though regulations have been complied with at the time that Mr. Brown was released from the system a week previously in an apparent effort to hide the Cabal's wrong-doing from federal investigators.   (One of these OSJ deputies, James Sexton, would continue to visit Plaintiff from time to time to discuss the Anthony Brown release and its aftermath.)  Plaintiff refused to comply with the request to "paper over" the prior improprieties associated with the release of Mr. Brown.

28. At some point shortly after the incident involving Mr. Brown, two of Plaintiff's supervisors visited her office and asked to be informed what happened during the incident.  Plaintiff told them her rendition of the facts and was met with silence in response.  Plaintiff began to be concerned that her career was in jeopardy.  At about the same time, Plaintiff became aware of discussions to the effect that the reason the OSJ deputies had tried to relocate Mr. Brown was to keep them from falling into the hands of federal investigators.

29. Thereafter, Plaintiff continued to carry out her job duties in the IRC.  During

1  this time, her supervisors and many of her coworkers appeared to avoid interaction
2  with her.  Plaintiff felt shunned.  In June and July of 2012, Defendant Deputy Juan
3  Sanchez "shoulder checked" Plaintiff twice -- i.e., deliberately knocking her roughly
4  with his shoulder.  Plaintiff had had no personal interaction with Deputy Sanchez
5  prior to that point.  Plaintiff is informed and believes and thereon alleges that Deputy
6  Sanchez acted based upon knowledge of the Brown incident, and under the continued
7  direction of Tanaka and the Cabal, and based upon rumors that Plaintiff would soon
8  be questioned regarding the matter by the federal authorities.  Plaintiff filled out a
9  work-place violence report on the two batteries, which she is informed and believes
10 was ultimately presented to Defendant Antuna, but is also informed and believes that
11 nothing was done to discipline Deputy Sanchez.

12    30.  In or about September or August 2012, Plaintiff received a federal grand jury
13 subpoena.  Plaintiff gave testimony before the federal grand jury in or about October
14 2012 concerning the foregoing incidents.  Thereafter, federal agents were repeated
15 visitors to the IRC whose procedures and practices they were trying to learn as part of
16 their investigation of the LASD.

17    31.  In or about October of 2012 one of the civilian workers in the IRC called to
18 Plaintiff's attention the fact that two inmates had had additional time added to their
19 sentence through a hand entry into the IRC's computer system.  There was no
20 legitimate reason why this should be so.

21    32.  Plaintiff undertook an investigation to see if other inmates had similarly had
22 additional time added to their sentences.  Plaintiff discovered to her alarm that
23 approximately twenty inmates had been subjected to such treatment.  The user
24 number from which all of this additional time had been entered belonged to a
25 employee who had been on disability for more than five years and could not have
26 possibly been the one to have actually have made the computer entries.  Defendant
27 Greg Sivard attempted to dissuade Plaintiff from her investigation and implied that
28 adverse consequences to her would result from her investigation.

33. Plaintiff prepared a report on her findings in this regard to her supervisor, Lt. Sheriff Kelly Porowski who took the matter over. Plaintiff would later learn through the rumor mill that overbooking of inmates at the LASD was among the subjects of the federal investigation into the LASD's wrongdoing.

34. Throughout this period of time, in part because of the tensions associated with working in the IRC following the Brown incident, and in part because it had always been her goal to be a patrol deputy, Plaintiff monitored opportunities to transfer into a patrol position. In or about October 2012, such an opportunity arose.

35. Specifically, Plaintiff was approached by a sergeant in the noncompliance unit of the LASD and informed Plaintiff that a position was opening for a female deputy in that department that he felt that Plaintiff was uniquely qualified for that position. In fact, based upon seniority and performance reviews, Plaintiff was far and away the most qualified female candidate for such position. Plaintiff applied for a transfer to the noncompliance unit.

36. Shortly thereafter, a friend of Plaintiff informed her that she had overheard a heated discussion between several high-ranking officers of the LASD the upshot of which was that Plaintiff's application for transfer would not be entertained on its merits. Plaintiff is informed and believes and thereon alleges that the reason she was denied the transfer was her role in and testimony regarding the Brown incident, as well as pressure from the Cabal.

37. Throughout this time, federal investigators were involved in serving multiple subpoenas on the LASD. The IRC in general, and Plaintiff in particular, were tasked with gathering documents responsive to the subpoenas. Because of the volume of materials responsive to the subpoenas, Plaintiff determined that the only way that there could be any assurance of full compliance with the subpoenas would be to cause the materials sought by the federal investigators to be reduced to an electronic form which Plaintiff arranged to occur. Shortly before she was going to pick up the electronic set of documents for production to the federal authorities, Lt. Porowski

PRINTED ON RECYCLED PAPER

FIRST AMENDED COMPLAINT FOR DAMAGES

learned of Plaintiff's planned course of action and angrily chastised Plaintiff for attempting to help the federal investigators beyond the strict letter of their document production requests. Lt. Porowski made it clear that he expected Plaintiff to do the bare minimum in cooperating with federal authorities and nothing more. Plaintiff is informed and believes and thereon alleges that in so doing, Lt. Porowski was acting in furtherance of the interests of the Cabal.

38. Shortly thereafter, a deputy Mark Camacho was assigned to work in the IRC. Among the workers in the IRC were civilian inmates who were on a work release program which required them to work at LAJ during working hours, and return to their homes at night. Deputy Camacho was physically abusive to these workers. Deputy Camacho also made it a practice to make comments under his breath loud enough for Plaintiff to hear regarding his disdain for deputies who "rat on [their] partners". Plaintiff complained about Mr. Camacho's behavior principally because it presented a danger to the civilian and work release employees, but also because it created a risk of physical violence of the office which jeopardized Plaintiff's safety as well. Plaintiffs superiors ignored her complaints about Mr. Camacho.

39. In or about March 2013, Plaintiff was visited by Deputy Sexton and another OSJ deputy who informed her that they believed that she was in physical danger, that she should "watch her back", that she should always have her gun with her and be prepared to use it. The deputies also warned Plaintiff that she should not text or make calls on her cell phone regarding sensitive matters because her cell phone communications were being monitored by corrupt elements within the LASD. Plaintiff is informed and believes that all of the foregoing activities were entered into in support of the Cabal.

40. In January 2013, Plaintiff discovered that she was pregnant. Thereafter, the elements described in the complaint that only made Plaintiff fear for her own personal safety, but for the safety of her unborn child and her family in general. Although the conditions in the IRC had become intolerable, Plaintiff endure them in till her

1 pregnancy leave in September 2013.

2   41.  In May of 2014, Plaintiff gave testimony in a federal criminal trial which resulted in the conviction and imprisonment of six LASD personnel. Further trials were expected to go forward in a few months.

  42.  Plaintiff's pregnancy leave was to terminate in June 2014. While, as of that time, Plaintiff was informed and believe that the climate at the LASD had not materially changed since her going out on leave, Plaintiff hoped that ultimately the aftermath of the trials would result in improved conditions in the LASD. As such, Plaintiff requested a six-month extension of her leave without pay – something that was generally granted to requesting employees of the LASD as a matter of course. Plaintiff's request was refused by Defendant Capt. Callier in furtherance of the conspiracy among the defendants and in direct retaliation for her giving testimony against the Cabal.

  43.  Plaintiff regarded and still regards such refusal as effectively requiring her to resign her employment at LASD because she feared that her physical safety and the safety of her family would be jeopardized if she returned to work. Plaintiff so informed Defendant Callier and further informed him that concern over her family as well as the stress created by the the treatment she received after the Ground incident were requiring her to tender her resignation. Defendant Callier responded by telling her that she could list only one reason for her resignation and that he would record that reason as being her family concerns.

  44.  At all times relevant to this Complaint, the Cabal acted in concert to prevent the Plaintiff from testifying in Court or otherwise cooperating with federal investigators. At all time relevant to this Complaint, such conduct was impermissible under Ninth Circuit law and the Defendants, and each of them, knew or were unreasonable in not knowing the same.

/ / /

/ / /

## CAUSES OF ACTION

## COUNT ONE

**Constitutional and Civil Rights Pursuant to 42 U.S.C. §§ 1983, 1988 Violation of First Amendment Speech Rights**

**(Against all Defendants)**

44. The foregoing allegations are incorporated as if re-alleged herein in full.

45. Through the foregoing acts, and each of them, the Defendants sought to and did retaliate against Plaintiff for her exercise of her constitutional right of free speech and did so under color of their authority as law enforcement officers. Defendants' efforts in this regard were also were intended to protect the Defendants' ongoing abuse under color of law of the constitutional rights of the inmates under their supervision.

46. As a result of the wrongdoing of Defendants, and each of them, Plaintiff suffered emotional and physical symptoms including extreme stress, crying jags, headaches, muscular pain and hair loss. Plaintiff also endured the loss of her chosen career.

47. As a result of the foregoing, Plaintiff has been damaged in an amount presently unknown to her, but to be proven at time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. For appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants.

B. For appropriate compensatory damages in an amount to be determined at trial;

C. For appropriate equitable relief against all Defendants as allowed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect Plaintiff's, or

others', employment opportunities;

   D. For an award of reasonable attorney's fees and costs on her behalf expended as to such Defendants; and

   E. For such other and further relief to which Plaintiff may show herself justly entitled.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: January 19, 2016        THE LAW OFFICES OF JOHN A. SCHLAFF

/S/

By _____
    John A. Schlaff
    Counsel for Plaintiff, TARA JAN ADAMS